Richard W. BOWLER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15402.

United States Court of Appeals Ninth Circuit.

Nov. 14, 1957.

R. Max Etter, Spokane, Wash., for appellant.

William B. Bantz, U. S. Atty., William M. Tugman, Riner Deglow, Asst. U. S. Attys., Spokane, Wash., for appellee.

Before ORR, POPE and CHAMBERS, Circuit Judges.

ORR, Circuit Judge.

Appellant, convicted on two counts of a six count indictment, complains that the evidence is insufficient to sustain the ver-

dict. He argues that his motion for acquittal made at the time the Government rested its case in chief should have been granted and that, at least, his second motion made at the conclusion of all the evidence should have been granted.

Appellant begins his argument by asserting that the evidence in its entirety discloses more than reasonable doubt as to appellant's commission of the crime charged, because it appears that a greater quantum of the evidence supports innocence rather than guilt. It is appellant's theory that the evidence was purely circumstantial and did not exclude every hypothesis of innocence.

■■ Appellant's conclusion that the evidence was purely circumstantial is erroneous. It is, in the main, direct. In any event, this court applies no special rule to review circumstantial evidence on appeal. Elwert v. United States, 9 Cir., 1956, 231 F.2d 928. We will not invade the province of the jury by attempting to determine where the weight of the evidence lies. The jury was convinced, as

shown by their verdict, that the evidence adduced demonstrated beyond a reasonable doubt that the appellant was guilty of the crimes charged in counts one and three. The indictment charged violations under § 17 of the Securities Act of 1933, 15 U.S.C.A. § 77q (1952), which makes it a criminal offense for any person in the sale of any securities by transportation in interstate commerce or by use of the mails directly or indirectly (1) to employ any device, scheme or artifice to defraud, or (2) to obtain money or property by means of any untrue statements of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

The indictment charged in the language of the statute and further set out with considerable particularity the alleged untrue statements of material facts and material facts which appellant is alleged to have omitted to state.[1] Appel-

I. Count one of the indictment was as follows:

"A. Prior to September 1, 1953, and continuing to the date of this indictment, the defendant Richard William Bowler devised and intended to devise a device, scheme, and artifice to defraud purchasers of the common stock of Spokane Warehouse and Storage Company, a Washington corporation, and to obtain money and property by means of the following false and fraudulent pretenses, representations, and promises, well knowing at the time that the pretenses, representations, and promises were and would be false when made:

"1. That Spokane Warehouse and Storage Company was in sound financial condition and operating at a profit.

"2. That dividends had been paid on this stock.

"3. That, based on the corporation's successful operations and profits, substantial dividends would be paid on this stock within a short time.

"4. That this stock had a market value in excess of ten cents a share.

"5. That, because of the corporation's successful operations and current profits, the market value of this stock would soon increase substantially.

"6. That this stock would soon be listed on a stock exchange and traded at a price substantially over the price at which it was being sold by defendant.

"7. That a purchaser of this stock could get his money back for his stock from defendant at any time upon the purchaser's demand within a period of from six months to a year, or some other fixed period of time.

"8. That the funds obtained from purchases of this stock would go to the corporation to be used for corporate purposes, including improvements to the corporation's parking garage, so as to increase the corporation's earnings and profits.

"9. That the stock being sold was either company stock or stock which was being sold at a sacrifice on behalf of a stockholder in an emergency situation.

"10. That there was only a very limited amount of stock for sale.

"It was a further part of said device, scheme, and artifice to defraud that at the time such false and fraudulent pretenses, representations, and promises were made the defendant intended to, would, and did knowingly and fraudulently conceal from purchasers and prospective purchasers of the common stock of Spokane Warehouse and Storage Company the

808

lant asserts that the crux of this appeal depends upon whether or not the government proved the existence of, or intention to devise, a device, scheme or artifice to defraud. Accepting that view, we proceed to a consideration of what was proven.

Appellant was the organizer and first manager of the Spokane Warehouse and Storage Company, which operates a parking garage and warehouse in Spokane, Washington. The company authorized a $350,000 bond issue secured by a mortgage and first lien, and at the times pertinent here this was the principal indebtedness of the company. Under its financial setup, no dividends could be paid on the common stock until the interest payments on the outstanding bonds were made. The net income was never sufficient to enable the company to meet these annual charges during the years 1953–1954. Interest arrearages increased each year, and the company did not make a net profit in any year in question, though its

following material facts necessary to be known by said purchasers and prospective purchasers in order that they would not be misled and deceived by the statements made by the defendant:

"(a) That this corporation was and had been operating at a loss.

"(b) That this corporation had outstanding $350,000 in bonds bearing 6% interest annually and secured by a first mortgage on all corporate assets.

"(c) That the corporation was in default in interest payments on its bonds to the extent of $10,500 for 1953 and $14,000 for 1954.

"(d) That the corporation from the time of its organization in October 1950 had never operated at a profit.

"(e) That the corporation's operations had resulted in an earned surplus deficit of over $48,000 by the end of the fiscal year on September 30, 1952, which deficit had increased to over $85,000 by September 30, 1953, and to over $100,000 by September 30, 1954.

"(f) That this earned surplus deficit would have to be eliminated and a surplus created before any dividends could possibly be paid on the corporation's common stock.

"(g) That defendant was selling his personally-owned stock and retaining the proceeds for his own use and benefit.

gross income steadily increased and its annual net losses were less each year. No attempt was ever made to list its stock with any stock exchange.

In September 1953, appellant (the principal stockholder) offered to take an option from the company to buy 118,850 shares at 7½¢ each, to enable the company to meet the next interest payment. He then began selling his own *personal* stock at 10¢ a share, replacing it with the 7½¢ company stock acquired with the proceeds of his sales, and the company was able to meet half of the interest payment in question. He continued to sell his personal holdings and by 1955 had sold 469,000 shares, nearly all at 10¢ a share.

Fourteen witnesses, thirteen of them farmers, testified as to appellant's statements made to them before he sold them stock in the corporation.

In September 1953 appellant sold stock to Miss Lala Dixon, a school teacher, who testified that "He [appellant] told

"B. On or about December 14, 1954, the defendant Richard William Bowler, having devised the scheme and artifice to defraud described in paragraph A above, did knowingly, wilfully, wrongfully, unlawfully, and feloniously employ said scheme and artifice to defraud in the sale of a security by use of the United States mails, said security and the use of the mails being described as follows:

"On or about January 27, 1955, near Ritzville, in the Northern Division of the Eastern District of Washington, the defendant in the sale of common stock of Spokane Warehouse and Storage Company did knowingly cause to be delivered by the mail, according to the directions thereon, a certain envelope addressed to Dan R. Anderson, containing a stock certificate, said envelope having theretofore on or about January 26, 1955, been placed and caused to be placed by the defendant in an authorized depository for mail matter to be sent and delivered by the Post Office establishment of the United States, according to the directions thereon, in violation of Sec. 77q, Title 15, USCA."

Count three alleged the same scheme and its use on or about December 17, 1954, in a sale to Loren P. Griffith, with use of the mails on or about January 26, 1955.

me that it would pay ten per cent dividends * * * not in 1953 because that was too late, but in 1954."

Two months later he sold stock to Frank Swannack: "* * * He indicated that the stock should pay a dividend of one cent a share some time after the first year * * * He indicated that the company was in good financial condition." Appellant also stated to him that he would list the stock on the Spokane exchange after the first of the year at 12 to 14 cents a share.

After another month, in December 1953, J. P. Helme bought stock after appellant told him that he had only 8,000 shares left to sell, that the company was selling the stock to secure money to construct more parking space, that the stock would be worth 13 to 15 cents a share after the first of the year, after which it would pay one cent a share, and that in four or five years after being listed it would yield 10 cents a share. He did not mention the company's bonds.

In February 1954 appellant sold stock to H. J. Franz, who testified that appellant said that "at present, the value of the stock was 10 cents a share * * * and that a dividend of 1 cent a share was to be paid October the 1st, 1954. * * * That the money was to be used for, among other things, repairing the roof on the building. * * *" Again, no mention was made of the bonds.

A month later he sold stock to Arthur Schorzman and said that it "was the last stock that was to be sold, and * * * was definitely paying six per cent, * * * that it was bound to keep on paying six per cent, and that the company was still having some indebtedness and when that is paid off they would pay ten per cent." "It was going to be put on the Spokane Stock Exchange and he expected it to be worth 12 cents in the near future."

Archie Zickler testified that appellant showed him a financial statement that "showed a good earning for the preceding period, I believe, and as of September '53 and the figures, the net profit on that sheet, would indicate that the company could easily pay ten per cent dividends on the stock outstanding." The stock "would soon be listed on the stock exchange and therefore, of course, enhance in value." The statement shown Zickler made no reference to bonds or to delinquent interest, and misleadingly showed a profit in excess of ten per cent.

About the same time, in March 1954, William Sutherland bought stock after being told "it was paying one cent a share or ten per cent. I believe he said that it had paid that this last year * * * that it was paying that now at this time." Appellant told him the stock would be on the exchange in June, that the proceeds from the stock were to be used to improve the parking facilities, and that he would agree to buy the stock back within a year at 10 cents a share.

A month later, in selling stock to W. G. Wahl, appellant told him "that it was a good investment and a paying proposition and * * * would probably pay us part dividends or something that first fall." He told Wahl that he was selling the stock to raise money to improve facilities.

Appellant's story to Oscar Wagner a month later, in May 1954, was somewhat different. He said that the company was to be reorganized to eliminate mismanagement and should pay seven per cent and go on the exchange whereupon it would double in price that summer. He said he had a consignment to sell all the company's stock, with the money to be used in the reorganization.

Four months later, in September 1954, appellant showed M. J. Hyde a statement that the business was operating at a profit and said that it would be on the exchange in a reasonable time.

Appellant told C. N. Heathman in November 1954 that the company was "an exceptional good business" and "had a very good income." Since the by-laws of the company allowed only a 5 per cent dividend and the company was making so much more than that, it would rise in value right after it was placed on the exchange at the first of the year. The witness understood that there were no

bonds and that he would be paid 5 per cent at once.

Appellant told Howard Underwood in January 1955 that the company was not in too good financial condition but would pay 6 per cent within two years. He also told him he would buy the stock back at any time for the same price.

Appellant told D. R. Anderson when he sold him the stock referred to in Count One, on which appellant was convicted, that "this stock was—the company was paying 5 per cent on the stock, the original investment, each September. * * * In other words, if you had bought some stock in that or buying stock in there, you would get 5 per cent on your money." When he was asked, "Did he tell you they had paid 5 per cent dividends in the past?" Anderson answered, "Yes, that's right." He also testified that appellant had told him something to the effect that the company could have paid 10 per cent but was retaining 5 per cent in the business. Appellant told him it was the last of the stock he had to sell, that it would be listed on a stock exchange in a month or two after it was all sold, and that it would be valued at not less than 12 cents. He was not told about the bonds or delinquent interest.

L. P. Griffith, whose stock is the subject of Count Three, on which appellant was convicted, testified that appellant read him a profit and loss statement, and that "Well, as near as I can recall, why, it made me believe that it was net income." "I was led to believe that there was a net profit." Appellant told him there was a mortgage and "he was selling stock to retire the mortgage, and when the mortgage was retired, then they would be able to pay dividends," and that the mortgage would be retired "as soon as all the stock could be issued. * * * Just as fast as he could sell them." Moreover, "as soon as all the stock was issued, it would be placed on the stock exchange." Appellant did not mention the amount of the bonds or the delinquent interest.

During the period in question, appellant had been the majority stockholder, was the initial promoter of the corporation and served as manager for part of the period, with his office in the company's building. He received financial statements prepared by the corporation showing its obligations and its operational losses. During this time he also frequently obtained current financial information from the corporation's accountants, records and officers.

■ Appellant argues that evidence given as to misrepresentations to those witnesses named in Counts Two, Four, Five and Six cannot be considered to show a device or scheme to defraud because verdicts of not guilty were returned as to them. Failure to consider the testimony of Miss Dixon, Franz, Schorzman and Heathman would not call for a different result in the case. We think, however, that it is proper to consider all the evidence in the case in determining whether or not a device or scheme was employed by appellant in making fraudulent misrepresentations and concealments on Counts One and Three.

■ A consideration of all the evidence presents a picture of appellant's operations and unfolds and depicts a preconceived idea or plan formulated by appellant to dispose of personal stock. The mechanics employed were those of the high pressure salesman intent upon selling his personal stock by methods wherein the use of misrepresentations was resorted to as a means to an end. He used, without compunction, the device of beguiling prospective investors into buying by the assurance of quick and substantial profits. This scheme was applied in full force to Anderson and Griffith and their purchases.

In the main the representations as to the value of the stock and dividends were shown to be untrue, which appellant well knew. It would tax the credulity of the most naive individual to believe that these stock selling campaigns were not the result of a procedure carefully thought out in advance. The more rosy the picture painted, the more likelihood of a stock sale, and if the actual factual situation stood in the way, it was to be

disregarded. The idea was not one which came on the spur of the moment. The pattern employed was too uniform to permit of that inference.

Affirmed.